An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-218

Filed 4 February 2026

Cumberland County, No. 22CR051118-250

STATE OF NORTH CAROLINA

v.

GARY BERNARD DUNCAN

Appeal by Defendant from judgment entered 2 May 2024 by Judge Matthew Brian Smith in Cumberland County Superior Court. Heard in the Court of Appeals 19 November 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Michael T. Henry, for the State.*
>
> *The Sweet Law Firm, PLLC, by Kaelyn N. Sweet, for the Defendant.*

WOOD, Judge.

Gary Bernard Duncan ("Defendant") appeals a jury verdict finding him guilty of first-degree murder. On appeal, Defendant argues the trial court erred by allowing substantive video evidence to be admitted without proper authentication and by providing confusing and misleading jury instructions regarding self-defense and

defense of home. For the reasons stated herein, we hold Defendant received a fair trial free from prejudicial error.

## I. Factual and Procedural Background

On 5 February 2022, Defendant hosted a social gathering at his house to watch a University of North Carolina vs. Duke basketball game. Just prior to midnight, Trenton Douglas ("Douglas") and Charles Elliot ("Elliot") arrived at Defendant's home after another guest invited them without objection by Defendant who was acquainted with both men. Years prior, Defendant had hosted a cookout during which he and Elliot got into an argument wherein Elliot hit and knocked out Defendant.

Although some other guests began to leave upon Douglas and Elliot's arrival, Asia Monroe ("Monroe"), who was good friends with Defendant, remained. Monroe was acquainted with Douglas but had not previously interacted with Elliot. Throughout the evening, Elliot attempted to "come on to" Monroe, but she was not interested and "brushed him off." Elliot left Monroe alone for a while, but once Monroe began dancing with Douglas, Elliot became angry and "started saying things" to Monroe. Elliot began recording Monroe with his phone. When Monroe knocked the phone out of his hand, Elliot hit her, allegedly knocking her unconscious. Monroe's, Elliot's, and Defendant's accounts of the next events varied slightly; however, they were consistent in that each reported Douglas was on top of Monroe in some capacity while Defendant and Elliot began to fight one another. During the fight, Defendant

retrieved a gun he had in the room. Elliot gained possession of the gun and hit Defendant over the head with it. Defendant claimed that Elliot threatened him and said, "I will kill your ass, I will kill your ass." Defendant was able to get away from him and ran upstairs. Elliot claims that at this point he told Douglas it was time for them to go, but Douglas told him to go ahead without him. Elliot asserts he last saw Douglas walking out the door of the house after him. With Defendant's gun still in his possession, Elliot ran down the street towards where Douglas' brother used to live.

Defendant retrieved another gun while upstairs and asked Monroe from the upstairs hallway, "Is they still down there?" Monroe responded that Douglas and Elliot were gone. Defendant testified that he closed and locked the door to the house but could see Douglas standing outside by the cars pointing what looked like a gun at him. Defendant further testified that he cracked the door back open and heard Douglas say, "[h]ey yo - - [Elliot] - - hey yo, [Elliot], let's shoot this mother f***er up." Defendant testified on direct examination as follows:

> [Defendant]: That's when I looked around and I jumped out the door and I just started shooting. I mean, he turned - - so he was trying to come back in the yard. He turned to try to come back in the yard so that's when I just started shooting.
>
> Q: When you say he turned, turned towards - - was he turning to - -
>
> [Defendant]: He turned that way.

Q: - - would be towards your house, correct?

[Defendant]: I don't know. But he turned - - when he turned - - he turned this way trying to come back around the car towards the garage - - toward the driveway.

Q: Okay. So that's when you started shooting?

[Defendant]: That's when I started shooting.

Q: Did you know how many times you shot?

[Defendant]: I don't know.

Q: The gun that you were trying to get, you testified that [Elliot] took it from you, correct?

[Defendant]: Yes.

Q: What caliber of gun is that?

[Defendant]: That was a .40.

Q: Did it have bullets in it?

[Defendant]: Yes.

Q: What was your intention trying to retrieve that gun?

[Defendant]: To make them leave my house. Get out. Get out my house. Please leave.

Q: Okay. So that at the time when you saw that your gun was out there - - they had your gun, correct? That .40, they had your gun at that time.

[Defendant]: Mm-hmm.

Q: When they were outside, correct? So when you heard [Douglas] saying let's shoot whatever up, that's reference to your house right?

[Defendant]: Yeah.

Q: Did you know or remember how many times you discharged that firearm?

[Defendant]: I shot pow, pow, pow.

Q: Then what happened after you shot pow, pow, pow?

[Defendant]: I went out there and I shot him again.

Q: Why did you have to do that?

[Defendant]: Because they was just downstairs, they tried to - - they tried to rape [Monroe]. He put that gun to my head and threaten to kill me also, and then they get outside and come - - get out there and then he come back talking about "Let's shoot this mother f***er up." What else was I supposed to do? We - - she didn't do nothing to him, and I didn't do nothing to him, but they wouldn't leave. He wanted to come back and still shoot us - - shoot us again to kill him. What else was I supposed to do? Let them kill us? We didn't do nothing to him or to neither one of them.

Q: When the shooting stopped, who called 911?

[Defendant]: I had told [Monroe] to call 911.

Q: Did you talk to 911 or did [Monroe] talk to 911?

[Defendant]: I remember talking to them on the porch.

Q: Telling them what happened?

[Defendant]: Yes.

Q: After the shooting, did you still have your gun in your hand?

[Defendant]: Yes.

Elliot heard the gun shots as he was running toward Douglas' brother's old house.

Elliot immediately called Douglas' brother to tell him that he thought Defendant had

shot Douglas.

When Officer Bryan Locklear ("Officer Locklear") and Sergeant Ricky Southerland ("Sergeant Southerland") of the Fayetteville Police Department arrived at the scene, Defendant told Officer Locklear that he had shot someone who tried to rob him. Sergeant Southerland testified that when the call initially came through, the shooting was identified as a possible home invasion, but when he "approached [Defendant and Monroe] to find out exactly what had occurred [he] determined that it wasn't a home invasion." Elliot returned to Defendant's house and turned over the gun he had taken from him to the police.

On 13 March 2023, Defendant was indicted on the charge of first-degree murder. On 2 April 2024, Defendant filed notices for the affirmative defenses of self-defense and defense of habitation. On 22 April 2024 Defendant came on for trial in Cumberland County Superior Court. On the first day of trial, the State filed a pretrial motion requesting a preliminary ruling on the admissibility of video footage obtained from Defendant's Ring security cameras. The State argued the video footage was admissible under 803(6) as business records kept in the regular course of business. In the alternative, the State argued that the video footage was also admissible under Rule 901. Defendant objected to the Ring camera footage and argued the videos were inadmissible because (1) the video footage was incomplete as each video should have been one minute long but many were shorter, and (2) the Ring camera devices were not working properly on the day in question as evidenced by the video clips that were

less than one minute long. Defendant stated he was not accusing the State of tampering with the videos, just that they were incomplete. The trial court overruled Defendant's objection and allowed the Ring camera footage into evidence.

During trial, Detective Tabitha Kiger ("Detective Kiger") of the Fayetteville Police Department testified she spoke with Defendant and Monroe at the scene. Defendant told Detective Kiger "the whole thing should be on video," and that he had the video on his phone. Defendant attempted to show Detective Kiger the video, but she stopped him, telling him it would be better to have the conversation at the police department. Detective Kiger noticed the Ring doorbell camera at the front door and walked through the house taking note of other cameras inside and out. While Detective Kiger did not view any playback footage on the night of the incident, she did see a monitor set up which "appeared to show the outside of the residence on the sides."

Detective Joshua Nevitt ("Detective Nevitt") testified that he collected serial numbers and MEIN numbers from the surveillance cameras around Defendant's house to pass along to Detective Kiger. Detective Nevitt testified that they use these numbers to send a "preservation request" to camera companies like Ring to "preserve all data that came from those cameras or any other camera that operates on that same cloud system." A search warrant to obtain the camera footage was issued and sent to Ring's law enforcement email address. Ring then emailed the information needed to log into their law enforcement website where the video records could be

downloaded. Ring cameras are "cloud based," and records from each camera are device specific. The email came from a Ring law enforcement specialist and contained a "certificate of authenticity" that stated:

> I, Jayme Junta, declare as follows:
>
> 1. I am an employee of Ring LLC, ("Ring"). I make this declaration based on personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify as set forth below.
>
> 2. Ring produced documents responsive to the above-referenced law enforcement request.
>
> 3. All documents produced by Ring are authentic, are what they purport to be, and accurately describe the transactions, communications, and events as set forth therein.
>
> 4. All documents produced by Ring are business records in that they are (i) records kept in the ordinary course of business; (ii) created at or near the time of the transactions or events reflected therein, or based on information from a person with knowledge of the transactions or events; and (iii) kept as a part of a regular business activity.
>
> I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

The email, Ring account and device information, and a spreadsheet with video file timestamps were admitted as State's Exhibit 81 without objection by Defendant during Detective Kiger's testimony. Detective Kiger further testified that she viewed all thirteen video files from the front doorbell Ring camera in State's Exhibit 407. State's Exhibit 407 was admitted and published without objection by Defendant.

During the charge conference the trial court indicated pattern jury instruction 206.10 would be used, "which is first-degree murder where a deadly weapon is used covering all lesser included offenses and self-defense felony. That includes self-defense as well as excessive force, first aggressor doctrine, and then as part of it I also added . . . 308.80 . . . defense of habitation." The trial court allowed the addition of "grossly excessive force or brutal or vicious circumstances of the killing" to be added as a circumstance by which the jury may infer a lack of provocation by the victim.

The State objected to the inclusion of defense of habitation, arguing Defendant was not entitled to the instruction; however, the trial court allowed the defense of habitation instruction based on Defendant's testimony that "they were trying to come back in his yard."

On 2 May 2024, the jury found Defendant guilty of first-degree murder. The trial court found Defendant to be a prior record level two and sentenced him to life imprisonment without parole. Defendant gave oral notice of appeal in open court.

## II.    Analysis

Defendant raises two issues on appeal. First, Defendant argues the trial court plainly erred by allowing State's Exhibit 407, thirteen Ring doorbell camera videos tending to show the shooting, to be admitted without proper authentication. Second, Defendant argues the trial court plainly erred by "providing confusing and misleading instructions to the jury regarding their consideration of [Defendant] having acted in defense of his home versus having acted in general self-defense and the presumptions

to which he was accordingly entitled."

## A. Appellate Jurisdiction

"Notice of appeal shall be given within the time, in the manner[,] and with the effect provided in the rules of appellate procedure." N.C. Gen. Stat. § 15A-1448(b). "Rule 4(a) of the North Carolina Rules of Appellate Procedure provides that an appeal in a criminal case may be taken by either 'giving oral notice of appeal at trial' or filing a written notice of appeal within 14 days after entry of judgment." *State v. Jones*, 296 N.C. App. 512, 515, 909 S.E.2d 373, 376 (2024) (quoting N.C. R. App. P. 4(a)). Oral notice of appeal given at trial prior to the "entry of the final judgment violates Rule 4 and does not give this Court jurisdiction to hear the defendant's direct appeal." *Jones*, 296 N.C. App. at 515, 909 S.E.2d at 376.

Defendant has filed concurrently with his appeal a petition for writ of certiorari on the grounds that his oral notice of appeal was premature. After reviewing the record, we find Defendant's oral notice of appeal was not premature or untimely. After the verdict was read and victim statements were given, Defendant entered oral notice of appeal as follows:

> [Defendant]: At this point after you sentence we will be entering a notice of appeal, Judge, after your sentence.
>
> THE COURT: You said after I sentence is that what you said?
>
> [Defendant]: Yes, sir.
>
> THE COURT: Okay. Thank you. This will be the judgment

> of the Court . . . The defendant is ordered to serve a term of life without parole in the department of adult corrections. . . . That is the judgment of the Court. *Show the defense has given notice of appeal.* Anything else further State in this matter?
>
> [The State]: No, Your Honor.
>
> THE COURT: Anything further from the defense in this matter?
>
> [Defendant]: No, Your Honor.

In *State v. Jones*, this Court held a defendant's oral notice of appeal to be premature when prior to sentencing the "defense counsel stated, 'Your Honor, Defendant would enter notice of appeal.' The trial court responded, 'Yes, sir, we'll accept notice of appeal[,]' [and then] [a]fter sentencing, the trial court again noted Defendant's notice of appeal and appointed the Appellate Defender." *Id.* (cleaned up). While similar to the case *sub judice*, *Jones* is distinguishable as there was no intent in the defendant's oral notice that the notice of appeal should have been entered *after* sentencing as is the case here.

Because Defendant, through counsel, made it clear his intent was to enter notice *following sentencing* and, further, the trial court acknowledged and stated for the record that notice of appeal had been entered *after sentencing*, we hold Defendant timely entered oral notice of appeal. Defendant's petition for writ of certiorari is unnecessary and dismissed as moot.

## B. Standard of Review

Defendant concedes he did not object at trial to the issues raised on appeal,

thus Defendant requests plain error review. "This Court applies the plain error standard of review for 'unpreserved instructional or evidentiary errors' which occur at trial." *State v. Gillard*, 386 N.C. 797, 820, 909 S.E.2d 226, 250 (2024) (quoting *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012)). To be successful on a plain error review:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Gillard*, 386 N.C. at 820, 909 S.E.2d at 250-51 (quoting *State v. Reber*, 386 N.C. 153, 158, 900 S.E.2d 781, 786 (2024)). "[T]he plain error standard requires a determination that the jury *probably would have* returned a different result," to meet the second prong. *Reber*, 386 N.C. at 160, 900 S.E.2d at 787 (quoting *State v. Towe*, 366 N.C. 56, 57, 732 S.E.2d 564, 564-65 (2012)). Our Supreme Court has reiterated:

> This standard—showing that a jury *probably would have* reached a different result—requires a showing that the outcome is significantly more likely than not. An event will "probably" occur if it is "almost certainly" the expected outcome; it is treated as synonymous with words such as "presumably" and "doubtless."

*State v. Allison*, __ N.C. __, __, 923 S.E.2d 485, 495 (2025) (cleaned up) (quoting *Reber*, 386 N.C. at 159, 900 S.E.2d at 787).

## C. Video Evidence

Defendant argues the State failed to lay a proper foundation for the admission of State's Exhibit 407, video footage purported to be from Defendant's Ring doorbell camera. State's Exhibit 407 contains thirteen video clips from the same camera, one of which tends to show Defendant exiting his home and firing multiple shots. Specifically, Defendant argues the State failed to establish that the "recording system was reliable and in good working order," and "the video recorded on the night of the incident matched the video played at trial." Defendant contends he was prejudiced by the admission of these video clips because they were "critical to proving the State's theory of premeditation and deliberation beyond a reasonable doubt," because the video shows "a pause in between [Defendant] firing his rounds" which the State contends indicated premeditation.

The State, in contrast, argues the video evidence was properly admitted as a business record because the videos were obtained directly from Ring and sent with a "Certificate of Authenticity" which "plainly satisfies the authentication requirement of 28 U.S.C. § 1746 as contemplated by Rule 803(6)." Regardless of whether the trial court erred in admitting State's Exhibit 407, a defendant must argue and offer support for each element of plain error on appeal or the issue is deemed abandoned. *State v. Patterson*, 269 N.C. App. 640, 645, 839 S.E.2d 68, 72 (2020). Here, Defendant has failed to provide the "necessary reasons or arguments as to why the alleged error rises to plain error. He offers nothing on why this is an exceptional case or why this

will seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* Absent Defendant's argument as to why the trial court's alleged error in allowing the video evidence within State's Exhibit 407 to be admitted without proper authentication warrants classification as an exceptional case, "we cannot impart any meaningful review for plain error." *Id.* Thus, we hold Defendant's arguments are abandoned and conclude the trial court did not plainly err by admitting State's Exhibit 407.

Further, we note Defendant also has failed to show that a jury *probably would have* returned a different verdict but for the alleged error. In his attempt to establish prejudice, Defendant contends the State relied on the video clips within State's Exhibit 407 to support the theory of premeditation and deliberation by commenting during closing arguments about the pause Defendant took between shots as shown in State's Exhibit 407.

Notwithstanding the trial court's admission of State's Exhibit 407, Defendant testified on his own behalf and gave the following description of events which tended to corroborate the video evidence from State's Exhibit 407:

> [Defendant]: When I cracked the door I'm listening and that's when [Douglas] said, "Hey, yo, 'G'." He said, "hey yo, [Elliot], let's shoot this mother f***er up." *That's when I looked around and I jumped out the door and I just started shooting.* I mean, he turned - - so he was trying to come back in the yard. He turned to try to come back in the yard so that's when I just started shooting.
>
> Q: When you say he turned, turned towards - - was he

turning to - -

[Defendant]: He turned that way.

Q: - - would be towards your house, correct?

[Defendant]: I don't know. But he turned - - when he turned - - he turned this way trying to come back around the car towards the garage - - toward the driveway.

Q: Okay. So that's when you started shooting?

[Defendant]: That's when I started shooting.

. . . .

Q: Did you know or remember how many times you discharged that firearm?

[Defendant]: *I shot pow, pow, pow.*

Q: *Then what happened after you shot pow, pow, pow?*

[Defendant]: *I went out there and I shot him again.*

Q: Why did you have to do that?

[Defendant]: Because they was just downstairs, they tried to - - they tried to rape [Monroe]. He put that gun to my head and threaten to kill me also, and then they get outside and come - - get out there and then he come back talking about "Let's shoot this mother f***er up." What else was I supposed to do? We - - she didn't do nothing to him, and I didn't do nothing to him, but they wouldn't leave. He wanted to come back and still shoot us - - shoot us again to kill him. What else was I supposed to do? Let them kill us? We didn't do nothing to him or to neither one of them.

Additionally, during closing arguments, Defendant's counsel stated:

Now, remember during my opening statement, right? That I did tell you that you're going to see a brief video recording displaying or showing my client coming out forcefully on

> his front porch with a rifle. That he stood his grounds on his front porch, and in that brief video recording, *you'll see him shooting and you see him walking to [Douglas] as he was on the ground and shot two more times. We did admit that.*

From Defendant's own testimony and closing arguments, the jury reasonably could have concluded for the purposes of premeditation and deliberation that Defendant paused between shots and knew at whom he was shooting. Thus, it would not be likely under the facts of this case for the jury to have returned a different result had State's Exhibit 407 not been admitted.

## D. Jury Instructions

Next, Defendant argues the trial court plainly erred by failing to properly articulate the order in which the jury must consider and reject Defendant's defenses before reaching a verdict on the substantive offense. Specifically, Defendant argues the trial court "merged" the jury instructions for defense of habitation and first-degree murder where a deadly weapon is used, which included all lesser included offenses. This included instructions on self-defense as well as excessive force and the first aggressor doctrine. Defendant argues he was entitled to have the jury instructed to consider first whether he was entitled to the presumptions of a defense of habitation instruction, and then, only if the jury rejected the presumption, to consider self-defense. After careful review of the record, we conclude the trial court should not have instructed on the defense of habitation, and Defendant cannot be prejudiced by such instruction which benefited him and to which he was not entitled.

During the charge conference, the State objected to inclusion of the defense of habitation instruction because there was no attempt at entry into Defendant's home or his curtilage at the time of the shooting. The State points to Defendant's own testimony where he stated that he saw someone by the car and heard him making threats. The trial court stated the sole reason it included the defense of habitation instruction is that Defendant testified "they were trying to come back in the yard." The trial court reasoned Defendant's testimony,

> was in and of itself, that [it] was them trying to make entry into [the] curtilage of the home which is why I included the instruction. I was not going to include that instruction until [Defendant] made that explicit statement that they were trying to come back in the yard.

The trial court further reasoned, "whether or not they were [trying to make entry] is a question of fact for the jury to decide whether or not there was enough credible evidence to support the instruction. I found that there was, that's why I added it in after the defendant testified." We disagree.

When a defendant is given a jury instruction to which they are not entitled, an error pertaining to that instruction cannot be found to have prejudiced the defendant when the instruction, error or not, benefited the defendant. *Cf. State v. Farrar*, 361 N.C. 675, 677-79, 651 S.E.2d 865, 866-67 (2007) (holding that when a trial court's charge to the jury was erroneous, but the error benefited the defendant, there is no prejudicial error). The principle of defense of habitation is commonly known as the castle doctrine. *State v. Carwile*, 297 N.C. App. 145, 150, 909 S.E.2d 913, 919 (2024).

- 17 -

Under the castle doctrine, "home" is defined as a "building or conveyance of any kind, to include its curtilage." N.C. Gen. Stat. § 14-51.2(a)(1). Curtilage has consistently been defined by our Courts to include "the yard around the dwelling and the area occupied by barns, cribs, and other outbuildings." *State v. Dilworth*, 274 N.C. App. 57, 62, 851 S.E.2d 406, 410 (2020) (quoting *State v. Blue*, 356 N.C. 79, 86, 565 S.E.2d 133, 138 (2002)). A lawful occupant of a home,

> is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:
>
> (1) The person against whom the defensive force was used was in the process of *unlawfully and forcefully entering, or had unlawfully and forcibly entered*, a home . . . or if that person had removed or was attempting to remove another against that person's will from the home . . . .
>
> (2) The person who uses defense force knew or had reason to believe that an *unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.*

N.C. Gen. Stat. § 14-51.2(b) (emphasis added). Defense of habitation makes the use of deadly force "justifiable whether to *prevent* the unlawful entry into the home or to *terminate* an unlawful entry by an intruder." *State v. Phillips*, 386 N.C. 513, 520, 905 S.E.2d 23, 29 (2024) (quoting *Blue*, 356 N.C. at 89, 565 S.E.2d at 139). "[O]ur statutes provide the Castle Doctrine presumption does not apply where 'the person against whom the defensive force is used (i) has discontinued all efforts to unlawfully and forcefully enter the home . . . and (ii) has exited the home.'" *Carwile*, 297 N.C. App.

at 151, 909 S.E.2d at 920 (quoting N.C. Gen. Stat. § 14-51.2(c)(5)).

When determining whether a defendant is entitled for the jury to be instructed on the defense of habitation, the trial court views evidence in the light most favorable to the defendant "and the determination shall be based on evidence offered by the defendant and the State." *Carwile,* 297 N.C. App. at 151, 909 S.E.2d at 920 (2024) (quoting *State v. Cook*, 254 N.C. App. 150, 152, 802 S.E.2d 575, 577 (2017)).

As discussed, the trial court gave the instruction for defense of habitation based solely on Defendant's testimony that he thought Douglas was trying to come back in his yard. However, the evidence tends to show that Douglas was invited to Defendant's home, a fight broke out, Defendant drew a gun, and Douglas voluntarily exited Defendant's home and curtilage. Then, Defendant shot at Douglas seven times from his front porch, *left* the curtilage of his home to enter the street, and continued to fire two additional shots at Douglas. Beyond Defendant's testimony, there is no other evidence tending to show Douglas having been within or trying to enter the curtilage of Defendant's home unlawfully or forcibly at the time of the shooting. Specifically, Defendant testified that:

> When I cracked the door I'm listening and that's when [Douglas] said, "Hey, yo, [Defendant]." He said, "Hey yo, [Elliot], let's shoot this mother f***er up." That's when I looked around and I jumped out the door and I just started shooting. I mean, he turned - - so he was trying to come back in the yard. He turned to try to come back in the yard so that's when I just started shooting.

Based on the evidence, even viewed in the light most favorable to Defendant, we

conclude Defendant was not entitled to the defense of habitation instruction as Douglas was originally invited to Defendant's home, had exited Defendant's home and curtilage voluntarily, and Defendant exited his own home and curtilage to shoot Douglas. Thus, substantial evidence was not presented at trial which would entitle Defendant to such an instruction. *See Carwile*, 297 N.C. App. at 152, 909 S.E.2d at 921 (holding "a trial court does not err by omitting an instruction where there is not substantial evidence presented at trial that the defendant is entitled to such an instruction.").

Therefore, regardless of whether the order in which the jury instructions were given was erroneous as Defendant contends, Defendant was not entitled to the defense of habitation instruction and its inclusion, error or not, was a benefit to Defendant and could not have prejudiced him.

## III. Conclusion

For the reasons stated herein, the trial court did not plainly err by admitting State's Exhibit 407 or by instructing the jury on the defense of habitation in the manner in which it did at trial. Thus, we hold Defendant received a fair trial free from prejudicial error.

NO ERROR.

Judges CARPENTER and GORE concur.

Report per Rule 30(e).